## BRENT et al. v. SIMPSON.

(Circuit Court of Appeals, Fifth Circuit.   December 19, 1916.)

No. 2977.

**1. EVIDENCE ☞459(5)—PAROL EVIDENCE—MISTAKE—RECEIPT.**

In an action by the trustee of a bankrupt corporation to recover securities pledged for the individual debt of the bankrupt's president, where the pledgee had given a receipt for the securities which was both an acknowledgment of their delivery to him and a contractual statement of the terms under which they were to be held, parol evidence that the receipt was made to read in favor of the corporation, instead of its president, through a mistake of the draftsman, related to the receipt in its character as such, and not in its contractual character, and was admissible.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1722, 2114; Dec. Dig. ☞459(5).]

**2. EVIDENCE ☞459(5)—PAROL EVIDENCE—MISTAKE—MUTUALITY.**

Even though the mistake in a receipt must be shown to be mutual, parol evidence that the deliverer of securities inadvertently placed the wrong name thereon tends to show a mutual mistake and is admissible.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1722, 2114; Dec. Dig. ☞459(5).]

**3. BANKRUPTCY ☞293(2)—JURISDICTION—RECOVERY OF PROPERTY—FRAUDULENT TRANSFER.**

Where a corporation had before its bankruptcy authorized, either expressly or by acquiescence, the transfer of securities belonging to it to secure an individual debt of its president without consideration moving to it, the transaction is only assailable if it was a fraud on the creditors of the corporation; and therefore the court of bankruptcy has jurisdiction of a suit to recover the securities, though it would not have jurisdiction if they had been misappropriated by the president without the corporation's consent.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 411; Dec. Dig. ☞293(2).]

**4. BANKRUPTCY ☞161(1)—FRAUDULENT CONVEYANCES—TRANSACTION AS SECURITY—RENEWAL OF DEBT.**

A corporation, several years before it became bankrupt, permitted its president to transfer notes belonging to it to secure an indorsement of the president's individual note.  On the renewal of that note, the payee asked for collateral security, and the indorsee delivered to it the notes previously pledged to him.  When the renewal note became due, the payee refused a further renewal, and the president borrowed the amount necessary to pay it from another bank, giving his note indorsed by the same indorser on his written promise that the securities released by the first payee should be transferred to the indorser for his security.  Thereafter the corporation became bankrupt, and the indorser was compelled to pay the note, and the trustee sued to recover the amount of the securities transferred to him.  *Held*, that the character of the transaction was to be determined as of the date of the first delivery of the notes to the indorser, not the date of the last delivery.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 261, 262; Dec. Dig. ☞161(1).]

**5. FRAUDULENT CONVEYANCES ☞271(4)—VOLUNTARY CONVEYANCE—INSOLVENCY—EXISTING CREDITORS.**

Under the Laws of Florida, a voluntary conveyance by an indebted grantor is prima facie fraudulent as to existing creditors, but proof that

the grantor was solvent, and that the transfer left it ample assets to pay its debt, overcomes the presumption of fraud.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. § 821; Dec. Dig. ☞271(4).]

6. FRAUDULENT CONVEYANCES ☞69(1)—VOLUNTARY CONVEYANCE—SUBSEQUENT CREDITORS.

Actual fraudulent intent on the part of the grantor is necessary to set aside a voluntary transfer at the instance of subsequent creditors.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 178–180; Dec. Dig. ☞69(1).]

7. FRAUDULENT CONVEYANCES ☞282—ACTIONS—BURDEN OF PROOF.

In a suit by the trustee of a bankrupt corporation to recover notes belonging to the corporation which had been transferred by its president with its acquiescence before maturity to secure an indorsement of the president's note, the burden is on the trustee to show that the indorser had notice that the president obtained the note from the corporation without consideration and that it was insolvent at the time so that its voluntary transfer was fraudulent.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. §§ 817, 818; Dec. Dig. ☞282.]

8. FRAUDULENT CONVEYANCES ☞158(1)—VOLUNTARY TRANSFER—INSOLVENCY —NOTICE TO TRANSFEREE.

Under Gen. St. Fla. 1906, § 2958, providing that every negotiable instrument is deemed prima facie to have been issued for a valuable consideration and every person whose signature appears thereon to have become a party thereto for value, notice cannot be imputed to the pledgee of notes belonging to a corporation, before their maturity, to secure the note of its president, that the president paid no consideration for the notes, and that the corporation was insolvent at the time, where all the stockholders of the corporation assented to the pledge, and the corporation continued to do business for more than three years, during which time it paid all of its creditors existing at the time of the pledge, except two who were willing to accept renewals of their claims.

[Ed. Note.—For other cases, see Fraudulent Conveyances, Cent. Dig. § 500; Dec. Dig. ☞158(1).]

9. CORPORATIONS ☞387(4)—ULTRA VIRES ACTS—RIGHTS OF CREDITORS.

Creditors cannot assail an ultra vires act of a corporate officer unless it resulted in depleting the assets of the corporation in fraud of creditors.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 1552; Dec. Dig. ☞387(4).]

10. BILLS AND NOTES ☞339—BONA FIDE HOLDERS—NOTICE.

Actual knowledge or willful abstention from inquiry by holders of negotiable instruments for value before maturity is necessary to charge them with notice of defenses; mere negligence or failure to inquire not being sufficient.

[Ed. Note.—For other cases, see Bills and Notes, Cent. Dig. §§ 821–823; Dec. Dig. ☞339.]

Appeal from the District Court of the United States for the Northern District of Florida; William B. Sheppard, Judge.

Suit by R. B. Simpson, as trustee in bankruptcy of the estate of Knowles Bros., a corporation, bankrupt, against Thomas W. Brent and others, as executors of the last will and testament of F. C. Brent, deceased. Decree for the plaintiff, and defendants appeal. Reversed, with directions to dismiss the bill.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

This is an appeal from a final decree of the District Court of the United States for the Northern District of Florida in a case in which the trustee in bankruptcy of the estate of Knowles Bros., a corporation, was plaintiff, and the executors of F. C. Brent, deceased, were defendants. The purpose of the bill was to compel the delivery by the defendants of certain securities, alleged to be the property of the bankrupt corporation, and which were in the possession of the executors. The bill charges that they were transferred by W. H. Knowles, who was the president of the bankrupt corporation, for it, in fraud of its creditors; it being insolvent at the time of the alleged transfer in April 1913, and the transfer having been made without consideration moving to the bankrupt. The purpose of the transfer is alleged to have been to indemnify the intestate, F. C. Brent, upon an accommodation indorsement, made by him at the instance of W. H. Knowles, to secure his personal obligation, the amount of which the executors of the said F. C. Brent, the indorser, have been compelled to pay, and for the reimbursement of which they are holding the securities. The obligation was a negotiable note of the Pensacola Investment Company, payable to W. H. Knowles, which he discounted at the Importers' & Traders' National Bank of New York City and which he and the intestate indorsed. The securities in question consisted of negotiable notes of third parties, secured by realty mortgages.

The answer of the defendant executors denies that the intestate acquired possession of the securities involved in the suit in April, 1913, as alleged in the bill, but, on the contrary, asserts that the intestate came into possession of them first in October, 1910, when they were delivered to him by W. H. Knowles to indemnify him against loss on an accommodation indorsement, then made by him at the request of W. H. Knowles, individually, and discounted at the Sullivan Banking & Trust Company of Montgomery, Ala. The amount of the loan, evidenced by the note, was $50,000. The original face value of the pledged securities was $100,000, reduced by the surrender by intestate to Knowles of a note for $30,000, secured by hotel stock, which left the face value of the remaining securities, which are here in question, $70,000. The answer asserted the validity of the transfer made in October, 1910, alleging that the securities were then pledged with intestate for value, i. e., for his indorsement on the $50,000 note, discounted by the Sullivan Banking & Trust Company; that they were transferred before maturity to intestate; that, at the time of the transfer, the corporation of Knowles Bros. was solvent and had enough assets to fully pay its debts, not including the pledged securities; that the intestate Brent had no knowledge or notice, at the time he accepted the securities for his indemnity, that W. H. Knowles had not given to Knowles Bros. value for them, or that Knowles Bros. was insolvent, if it was then insolvent. The answer also relied upon the Florida statute of limitations of three years, as a defense to the right of the trustee to recover the securities; and denied the jurisdiction of the District Court. The answer alleged, and the evidence showed, that after the original pledge of the securities by Knowles to intestate Brent in October, 1910, upon the occasion of the renewal of the note held by the Sullivan Banking & Trust Company, the bank asked for collateral, as well as personal, security, and, in pursuance of the bank's request, Brent, or Knowles for him, transmitted the securities, which had been pledged with Brent, to the Sullivan Banking & Trust Company. Upon a subsequent maturity of the note at the Montgomery bank, a misunderstanding arose as to its renewal by that bank, and W. H. Knowles thereupon arranged to get the money, with which to take it up, from the Importers' & Traders' National Bank of New York upon a note, indorsed by intestate Brent as stated. Before the indorsement of the note, discounted at the New York bank, and on April 15, 1913, W. H. Knowles, by letter to intestate, agreed that he, in consideration of his indorsement, might hold for his security the securities originally pledged to him, and which he had turned over to the Sullivan Banking & Trust Company as stated. The note to the Importers' & Traders' National Bank was dated April 19, 1916. On April 30, 1913, the securities here in question were received by W. H. Knowles from the Montgomery bank, and delivered by him to the attorney in fact of intestate, pursuant to the letter of April 15, 1913; the receipt given by intestate or his son and attorney in fact for the securities reciting that they were received from Knowles Bros.

W. A. Blount, A. C. Blount, Jr., and F. B. Carter, all of Pensacola, Fla., for appellants.

W. H. Watson and S. Pasco, Jr., both of Pensacola, Fla., for appellee.

Before PARDEE and WALKER, Circuit Judges, and GRUBB, District Judge.

GRUBB, District Judge (after stating the facts as above). [1, 2] The appeal presents a number of questions upon the admissibility of evidence, only one of which is important under the conclusions we have reached. The appellant offered evidence tending to show that the receipt for the securities in controversy dated April 30, 1913, was made to read in favor of Knowles Bros., instead of W. H. Knowles, through mistake of the draftsman. The court excluded this evidence, upon the ground that its effect was to vary the terms of the receipt, which were of a contractual nature. The receipt was twofold in character. It was an admission by the signer of the receipt of the pledged securities, and it was a contract setting out the terms on which they were to be held by the signer. In the first respect it was explainable by parol evidence. In the latter, it was not. Clearly the personnel of the deliverer of the securities was a matter that related to the instrument in its character as a receipt, rather than in its contractual character. Wayland's Adm'r v. Mosely, 5 Ala. 430, 39 Am. Dec. 335. It may be that the mistake, to be effectual, would have to be shown to be mutual; but the fact, if it was a fact, that the deliverer of the securities, who drafted the receipt, inadvertently placed the wrong name on the receipt, was evidence tending to show a mistake on the part of both parties to it, and competent.

[3] The appellants contest the jurisdiction of the court below, and cite the case of Park v. Cameron, 237 U. S. 616, 35 Sup. Ct. 719, 59 L. Ed. 1147, in support of their contention in that respect. We do not think that case is controlling of this case. In either aspect of this case, certainly if the transaction of October, 1910, is the applicable one, the case is not one in which an officer of a bankrupt corporation has embezzled or misappropriated property of a corporation without its knowledge or consent, recovery of which is sought from him by the trustee. We think, as to both transactions, the record shows that W. H. Knowles' transfers of the securities in controversy was authorized expressly or by acquiescence by Knowles Bros., and is assailable, if at all, because it was a transfer without consideration moving to the bankrupt, and under circumstances making a voluntary transfer a fraud upon its creditors.

[4] The question most seriously contested was that as to which transaction—that of October, 1910, or that of April, 1913—was to be looked to in determining the rights of the parties. The trustee contended, and the District Judge held, that the transfer of April, 1913, was the determinative one. The District Judge held that the transaction with the Importers' & Traders' National Bank of New York City was separate and distinct from that of the Sullivan bank pledge; that it embraced different parties and a different contract; that intestate's indorsement to the Sullivan bank was still subsist-

ing when he indorsed the note subsequently discounted in New York City, and the securities then held by the Sullivan bank; and that intestate by delivering the securities to the Sullivan bank extinguished the bailment and ended his rights as pledgee in the transactions with that bank. It must be conceded, however, that there was but one debt of $50,000 for which W. H. Knowles was always primarily liable, and the intestate Brent always secondarily liable, until it was paid by his executors after the note to the New York bank matured; that the securities in controversy were originally pledged by W. H. Knowles to intestate to secure his secondary liability for said debt; that he surrendered possession of the securities to the Sullivan bank, not in disregard of the object of the original pledge, which was to hold him harmless on his indorsement, but in furtherance of it, since payment of the debt out of the securities would have relieved him from liability on his indorsement; that, when the Sullivan bank was reluctant longer to renew the notes evidencing the original debt, the money to pay the debt was only procured from the New York bank on intestate's agreement to indorse and actual indorsement of the note to that bank, which yielded the proceeds to take up the note at the Montgomery bank; that the indorsement of intestate was given upon a written promise, given by W. H. Knowles, that the securities, released by the payment of the note to the Sullivan bank out of the money obtained from the New York bank on intestate's indorsement, should be pledged with intestate to secure his new indorsement, which was done.

Under the facts, a court of equity should consider the pledge of the securities uninterrupted from the date of their original delivery to intestate in October, 1910. The identity that is essential is the identity of the debt, not that of the parties to the notes evidencing it. The principal debtor in the note to the New York bank was W. H. Knowles, just as he was in the note to the Sullivan bank. That there were additional or different parties for accommodation to the later note, or that the original parties occupied different positions on it, is unimportant, so long as the original debt and the original debtor, secured by the same indorser, are present. It is clear that the intestate would not have consented to surrender the securities to the Sullivan bank, except to accomplish the payment of the debt due it, for which he was secondarily liable. His doing so was pursuant to, not in contradiction of, the original pledge. It is also clear he indorsed the new note for the purpose of taking up with its proceeds the note on which he was already contingently liable. This was the effect of the written agreement between Knowles and intestate. It was also agreed that the securities, held by the Sullivan bank to secure the original debt, should be given intestate, when they were released by payment of that debt, to protect him on the new indorsement. Had it not been so, he would have been the worse for the new transaction, since he would then have been without security for his indorsement in the same amount. There was never a time from the intestate's indorsement of the original note to the Sullivan bank in October, 1910, until the debt was paid by his executors, when he

could have relieved himself from that indorsement. We can discover in the record no evidence of an intention on his part or that of Knowles, either to double the liability assumed by him upon his original indorsement, when he indorsed the note to the New York bank, or to relinquish the protection of the pledge of the securities given to secure his original indorsement. It follows that he was always liable because of his indorsement of the original note of October, 1910, and always protected against liability on that indorsement by the securities, which the trustee now seeks to recover from him. This would make the transaction of October, 1910, the controlling one, and the question of the bankrupt's solvency or insolvency would revert to that date. 32 Cyc. 243; Nesbit v. Worts, 37 Ohio St. 378; Jarboe v. Shiveley, 109 Ky. 402, 59 S. W. 328, 95 Am. St. Rep. 384.

[5, 6] The transaction having occurred more than four months before the petition was filed, its validity is to be determined by the laws of Florida. Under the laws of Florida, a voluntary conveyance by an indebted grantor is prima facie fraudulent as to existing creditors. A showing that the grantor was solvent and that the voluntary transfer left it ample assets to pay its debts overcomes the presumption of fraud. If Knowles Bros. was solvent, in this sense, in October, 1910, the transfer, though voluntary, was valid. Actual fraudulent intent on the part of the grantor is necessary to set aside a voluntary transfer at the instance of subsequent creditors. No such claim is made in this case. The solvency of the bankrupt in October, 1910, is not very satisfactorily established by the record. It is only supported by certain trial balances, which are merely an enumeration of credit and debit items, as shown by the books of the bankrupt, with no showing as to the real value of the credit items. The District Judge found it unnecessary to determine the question of insolvency at an earlier date than April, 1913. If the determination were necessary to a decision of the appeal, we would hesitate to rule on it, on the present record.

[7] However, in order for the trustee to avoid the transaction as against the executors of the intestate, it must appear that intestate was a holder of the negotiable notes pledged, in bad faith or with notice of their infirmities. The intestate in October, 1910, took the negotiable notes from W. H. Knowles, who had possession and apparent title, for a valuable consideration, viz. his indorsement of W. H. Knowles' $50,000 note, and before maturity. In this attitude, the burden was on the trustee to show that the intestate had notice of any infirmity in the notes. This is the settled rule under the Florida and federal decisions. It is conceded that the intestate Brent, when he took the notes from Knowles in October, 1910, knew that they had been the property of Knowles Bros., and were being used by W. H. Knowles for his individual benefit. There is no evidence, however, that intestate then knew either that Knowles had obtained the securities from Knowles Bros., the bankrupt, without paying value for them, or that he knew that the bankrupt was then insolvent. The transaction could be assailed by creditors of the bankrupt only if those facts were true, and, as against a holder for value before

maturity of the notes, only by showing notice to him of those facts, when he obtained the notes.

[8, 9] Conceding that a taker of the notes might be charged from the indorsement on their face of any want of authority from the corporation on the part of the president of the bankrupt to deal with them for his own benefit, there was no such want of authority as to the October, 1910, transfer, since it was assented to by all stockholders of the bankrupt corporation. Nor could creditors assail a merely ultra vires act of a corporate officer, unless it also resulted in depleting the assets of the corporation in fraud of creditors. Force v. Age-Herald Co., 136 Ala. 271, 33 South. 866. Under the Florida statute, section 2958, General Statutes 1906:

"Every negotiable instrument is deemed prima facie to have been issued for a valuable consideration; and every person whose signature appears thereon to have become a party thereto for value."

It is also true that the bankrupt, if not actually solvent in October, 1910, continued thereafter to do business for more than three years as a going concern, and paid all its then creditors in full, except two, who were content to renew their claims till bankruptcy intervened. It seems difficult to predicate notice to the intestate of an insolvent condition, if existent, that withstood bankruptcy for that period, and of which the bankrupt's officers and creditors seemed unaware.

[10] Especially is this true in view of the settled rule in favor of holders for value before maturity, adopted by the federal courts, that actual knowledge or willful abstention from inquiry, where inquiry would have disclosed the infirmity, is essential, and that mere negligence, or a failure to inquire, where a reasonably prudent man would have inquired, will not suffice. Applying this rule to the facts in the record, we cannot impute notice to intestate either of the fact that W. H. Knowles paid no consideration for the transfer of the securities in controversy to him to Knowles Bros., in October, 1910, or that the bankrupt corporation was then insolvent or would render itself unable to pay its debts by the making of the voluntary transfer to its president. The following authorities support our conclusion: Doe v. Northwestern Coal Co. (C. C.) 78 Fed. 62; Troy & Cohoes Shirt Co., Bankrupt (D. C.) 136 Fed. 420; Kaiser v. First National Bank, 78 Fed. 281, 24 C. C. A. 88; Union National Bank v. Neill, 149 Fed. 711, 79 C. C. A. 417, 10 L. R. A. (N. S.) 426; National Bank of Commerce v. Sancho Packing Co., 186 Fed. 257, 110 C. C. A. 112.

We find it unnecessary, in view of the conclusion reached, to decide the effect of the statute of limitations upon the transaction of October, 1910, or the claimed want of creditors who are in a position to successfully assail that transaction, and furnish proper representation to the trustee in bankruptcy in his endeavor to do so.

The decree of the District Court will be reversed, with directions to dismiss the bill at the trustee's costs. If there is an equity in the securities in controversy over and above what the executors were compelled to pay on account of their intestate's indorsement, the trustee, on proper application and tender, should be permitted to redeem them from the executors.